## City of Chicago, Defendant in Error, v. A. J. Perdue, Plaintiff in Error.

### Gen. No. 14,336.

CRIMINAL LAW—*effect given to evidence of good character.* In a prosecution for a criminal offense, where a serious doubt arises under the evidence as to the guilt of the accused, evidence of good character will prevail.

Error to Municipal Court of Chicago; the Hon. FREDERICK L. FAKE, Judge, presiding. Heard in this court at the March term, 1908. Reversed. Opinion filed March 22, 1909.

S. A. McELWEE, for plaintiff in error.

No appearance by defendant in error.

MR. JUSTICE BROWN delivered the opinion of the court.

The plaintiff in error, a colored man, was arrested and tried before the Municipal Court of the city of Chicago, for a violation of section 1454 of the Revised Municipal Code of Chicago, and found by a jury guilty of a violation of the same. The jury assumed "to assess his fine" at one hundred and fifteen dollars, an assessment which the court acquiesced in, rendering judgment, as it appears in the transcript, that "the plaintiff have and recover of the defendant the said one hundred and fifteen dollars upon the verdict heretofore rendered in this cause, for its debts and also its costs and charges herein taxed at ............dollars, and that it have execution therefor".

A motion for a new trial had been heard before the judgment, and considerable amount of new evidence in one form and another introduced on it, but the motion was denied. To reverse this judgment the defendant sued out a writ of error from this court which has been made a supersedeas.

The city has filed no appearance or briefs in this court. We have taken the case under careful consideration from the record. Some objection is made by the defendant to the irregularity of the complaint, verdict and proceedings, but we have disregarded it. We prefer to place our decision on the merits as they appear from the transcript of the record.

The "bill of particulars", which the prosecution was ruled to make, was contained in a note from the city prosecutor's office to the defendant's attorney, in which the prosecutor said that he would prove "that the defendant did on October 17, 1907, at about 4 P. M. on said day, at the corner of an alley running north and south between Ellis and Drexel avenues, on the

north side of Forty-fifth street, in said city of Chicago, commit an act tending to a breach of the peace, to wit, that the said Perdue did then and there accost one Theresa Newberg, a child aged thirteen years, residing at 4437 Ellis avenue, and attempted by force to drag said Theresa Newberg into said alley, but was prevented by one Laurine Bremner from so doing. That said Perdue has been guilty on divers occasions of forcing his attention upon children residing in said locality".

The evidence adduced to support this alleged violation of the ordinance, or any other violation of it, seems to us weak, independently of the very strong testimony of good character given for the defendant, and independently of the evidence heard on the motion for a new trial directly contradicting the prosecuting witnesses. Theresa Newberg, a girl thirteen years old, swore that about a year before, as she was going home from school, the defendant "threw kisses at her and winked and bowed"; that three months after he came up to her, when she was walking with another girl named Laurine Bremner, about the same age, and "grabbed" her by the sleeve of her coat. Witness said "Stop that", and the defendant said, "I'm not going to hurt you". Then she and Laurine ran away.

Nathalie Newberg, a sister of this witness (it does not appear whether younger or older), testified that about a month before the trial—"Sometime in the morning"—the defendant passed their home while her sister Theresa and she were sitting on the porch. Being asked, "What did he do?" she answered, "Whenever he sees us he begins whistling and singing and beckoning, like that" (indicating). The examination proceeded thus:

"Q.  What direction was he going?

A.  He was going north. He walked a few steps and then he turned and beckoned again.

Q.  What was his manner of beckoning?

A. It was terrible,—he laughed and leered and whistled and beckoned like this". (Indicating). "Theresa was afraid and wanted to go into the house, and I said, 'No, you go on reading. He can't hurt you.' And we went on doing what we were doing, and he went up the street after he saw we didn't pay any more attention to him".

Nathalie Newberg also testified that during the month of October (the month of the trial), at about dusk as she was going along Forty-fifth street, she heard some one whistle and when she looked across the street she saw the defendant there. He whistled and laughed again, and quickened his pace when she quickened hers, and slowed up when she slowed up. "He was walking parallel with me", she says, "and then when he got to the crossing he didn't know whether he was going or not—some automobiles were coming, and he decided to go the other way".

Helen Kuh, a little girl eight years old, also swore that when she was with Laurine Bremner one day, the defendant, who was washing windows near by, said that he had some candy for them, but they made no answer.

The defendant denied absolutely all the charges of "throwing kisses" or "whistling" to the girls, or taking either by the arm, or saying anything to either of them, although he said all the children in the neighborhood where he did janitor work knew him by sight. He produced an abundance of testimony to his good reputation for morality, industry and temperance.

On the motion for a new trial it was shown by apparently satisfactory evidence that Laurine Bremner had, on examination by her father, denied the truth of Theresa Newberg's story as far as it related to herself, and told him that the only thing she could think of as a basis for it was, that one day when she was on her way to school and Allen Perdue was sprinkling a lawn, he said, "Wait a moment, little dears, and I will take the hose out of the way". It also ap-

peared that at the trial Laurine Bremner was in the hallway of the court building with her father and Theresa Newberg attempted to induce her, against her protest that she knew nothing of such an incident, to "tell about" the defendant's "catching her by the arm". "For", she said, "if you don't tell the same story that I did, you will make me out a liar". This excited the Bremner girl to a high degree, and after being taken into the court room by an officer, she was taken away by her father without testifying, whereupon counsel for the prosecution remarked in the presence of the jury that said condition was the result of fear of the defendant, and that thereby the prosecution was deprived of her testimony.

The mother of Helen Kuh testified that Helen had never varied her story, but said that she, the mother, had expressed the opinion—with which we coincide—that it would be rather absurd to convict a man of any offense by it.

The exact truth it may not be possible for us to arrive at, but the defendant is entitled to the benefit of the very pronounced doubt which we entertain, whether the whole story of improper attentions did not spring from the over excited imaginations of young children, to whom suggestions of danger from colored men have been made. When a matter of this sort is in doubt, evidence of character should prevail. We do not think there is sufficient evidence in this record to convict the defendant of any offense against the city ordinance, and the judgment of the Municipal Court of Chicago is reversed.

*Reversed.*